**MONSANTO COMPANY**

v.

**DAWSON CHEMICAL COMPANY and Crystal Chemical Company.**

**Civ. A. No. 68-H-400.**

United States District Court,
S. D. Texas,
Houston Division.

April 14, 1970.

C. Frederick Leydig and John A. Rosenquist, Wolfe, Hubbard, Leydig, Voit & Osann, Chicago, Ill., Arnold H. Cole, St. Louis, Mo., and Garrett Tucker, Jr., and Larry Feldcamp, Baker, Botts, Shepherd & Coates, Houston, Tex., for plaintiff.

John McConn, Jr., and Ned L. Conley, Butler, Binion, Rice, Cook & Knapp, and Carl B. Fox, Jr., Houston, Tex., for defendants.

## Memorandum and Order

SINGLETON, District Judge.

This is a patent infringement suit between the patentee, plaintiff, and the alleged infringers, defendants, who have counterclaimed for a declaratory judgment nullifying plaintiff's patent. Plaintiff is a Delaware corporation with its principle place of business in St. Louis, Missouri. Defendant Crystal Chemical Company is a Florida corporation with its principle place of business in Houston, Texas within this judicial district. Defendant Dawson Chemical Company is a Texas corporation that is wholly owned by defendant Crystal Chemical Company and has its principle place of business also in Houston, Texas. Because this action arises under the patent laws of the United States, there is jurisdiction under 35 U.S.C. § 271 and 28 U.S.C. § 1338 and venue is proper under 28 U.S.C. § 1400.

The subject matter at the heart of the dispute is a chemical compound known as 3,4-dichloropropionanalide. This compound, also known as propionil or 3,4-DCPA, is one having herbicidal activity. It is the active ingredient in commercial herbicide formulations sold by plaintiff and defendants for use in selectively killing weeds in the presence of rice. Because of this characteristic, it is said to be a selective, post-emergence herbicide, or one which, when generally applied to plants which have sprouted, selects and kills certain of them while leaving others standing and unharmed.[1] Plaintiff's patent issued on May 7, 1968, the same date this suit was filed, on the basis of an application which was presented to the United States Patent Office on February 3, 1967. The application contained a single claim reading: "3,4-dichloropropionanalide." That 1967 application was a division of an application filed May 8, 1961, which in turn was a continuation-in-part of an application filed May 27, 1957. In all three applications Dr. Clarence W. Huffman was named as the inventor.

Plaintiff began selling its herbicide, Rogue, containing 3,4-DCPA in early 1962, and has sold it continuously since that time. The defendants, Dawson and Crystal, first sold their herbicide composition in December of 1967. Since it admittedly contains 3,4-DCPA, there is no question but that defendants have infringed the patent if it is valid. Defendants, however, contend that the patent is not valid and that they have, therefore, not infringed.

3,4-DCPA is a member of a class of compounds known as analides. The May 27, 1957 patent application filed in Dr. Huffman's name disclosed a large class

---

1. This is to be contrasted from non-selective herbicides which kill all plants with which they come into contact and pre-emergence herbicides which kill all plants before they sprout from the ground.

of 3,4-dihalogen substituted analides[2] as being useful herbicides. Among these disclosures was 3,4-DCPA, although the claims in that application were directed only to its use; it was not claimed as a compound. Apparently, Huffman knew of no disclosure in the prior art of the herbicidal properties which are characteristic of some analides.

Huffman's second patent application, filed on May 8, 1961, narrowed somewhat the range of compounds claimed as herbicides. 3,4-DCPA was likewise disclosed in this continuation-in-part of the 1957 application. From May 27, 1957 until May 7, 1968, when the patent issued, there was continuously pending in the Patent Office a disclosure of the compound 3,4-DCPA, its method of preparation, and experimental evidence of its activity as a herbicide.

There is no doubt that 3,4-DCPA is a novel composition of matter and that 3,4-DCPA was not only disclosed as a useful herbicide, but that, indeed, it has found very substantial commercial utility as a herbicide. Dr. Huffman was hired in 1952 by the Lion Oil Company in El Dorado, Arkansas, for the specific purpose of instituting a research program in the field of herbicides and defoliants. 3,4-DCPA was invented in the course of that program. Monsanto purchased Lion Oil Company about mid-1955 and merged Lion into Monsanto.

For the most part, the research program was carried out either by Huffman or by his assistant synthesizing the chemical compounds to be tested as herbicides and defoliants. Huffman also purchased some of the candidate compounds, but these amounted to no more than about 20% of the total tested in the course of the program. Some of the compounds tested as herbicides and defoliants during the course of the research program which were synthesized by Huffman were thought to be new compounds, but a number of the compounds synthesized by Huffman, and, of course, all the compounds purchased by him, were known to chemical science.

Because Lion Oil had no greenhouse facilities of its own to screen and test herbicide candidates on plants, Lion entered into two contracts with the Midwest Research Institute, a private, nonprofit research organization located in Kansas City, Missouri, to carry out the testing of the candidate chemical compounds sent to it by Huffman for herbicidal and defoliant properties. In the course of the Lion Oil herbicide research program and the contract with Midwest Research Institute which terminated at the end of 1955, Dr. Huffman sent about 300 different chemical compounds to Midwest for screening as herbicides and defoliants. The herbicidal activity which Dr. Huffman was searching for included at all times during his research program both pre-emergence and post-emergence activity. Dr. Huffman conceived of 3,4-DCPA and had it synthesized for the specific purpose of determining its herbicidal and defoliant properties.

The chemical compounds tested by Midwest for Dr. Huffman were of many different chemical types. Huffman initially sought to test compounds which in terms of their chemical structure were similar to certain then commercially available herbicides. By 1954, however, he had evolved a novel theory which led him to select his candidate chemicals in a dif-

---

2. The structure of 3,4-DCPA starts with a modified benzene ring at one end of the molecule with an analide radical, comprised of three carbon atoms, six hydrogen atoms, and one atom each of nitrogen and oxygen, attached to the ring in the one position. There are also attached to the ring hydrogen atoms in the two, five, and six positions and chlorine atoms at three-four positions. To put it in a pictorial fashion:

[A1714]

It should be understood that the benzene ring is a hexagonal chain consisting of a carbon atom at each of its six corners.

ferent and unique way. Dr. Huffman made scale models of the molecules of a number of commercially successful herbicides and measured their over-all dimensions. He found that when stretched out several were about 13 angstroms in length and that when compressed they measured about 10 angstroms. Based on these findings he formed models of other chemical compounds which approximated such dimensions and which had no known herbicidal activity, many of which like 3,4-DCPA had never even been made before. He then proceeded to synthesize and have those chemicals tested as herbicides.

In late 1954, during the course of his herbicide research program and as a result of his examination of the scale models, he gave instructions to Mr. Swafford, a chemist assisting him, to synthesize 3,4-DCPA, a compound having approximately the desired dimensions. By January 11, 1955, 3,4-DCPA had been synthesized by Mr. Swafford for Dr. Huffman. It was sent along with a group of other compounds, including 2,4-dichloropropionanalide,[3] a known chemical compound also having the same dimensions as 3,4-DCPA, but which likewise had never been tested as a herbicide. Dr. Huffman expected the 2,4-dichloropropionanalide to show superior herbicidal activity as compared to 3,4-DCPA because the 2,4 substitution of the chlorine atoms in that compound was similar to that in the well-known selective post-emergence herbicide 2, A–D. But as it turned out, 2,4-dichloropropionanalide showed essentially no herbicidal activity while 3,4-DCPA and the closely related 3,4-dichloro-isobutyranalide,[4] also ostensibly first synthesized by Dr. Huffman, proved

to have the highest activity on the plants treated at Midwest.

The testing of 3,4-DCPA by Midwest Research Institute was completed by May, 1955. Its report dated June 15, 1955, explicitly stated that 3,4-DCPA had demonstrated high activity, but that 2,4-dichloropropionanalide should be dropped from further consideration. The data on the herbicidal testing of 3,4-DCPA set forth in Midwest's report showed that all of the plants sprayed with the herbicide formulation containing that compound were killed except rye grass which was not completely killed, although about 90% of the stand of rye grass was killed. This indicated to Dr. Huffman that 3,4-DCPA should be tested further for selectivity on such plants and that the next logical step was to retest at a lower dosage or rate than eight pounds per acre at which Midwest conducted its initial screening. In a later test of 3,4-DCPA on rye grass and other plants at the rate of one pound per acre, some of the same plants killed with 3,4-DCPA killed at eight pounds per acre were again killed at one pound per acre, but the rye grass was completely unharmed, thus confirming the prior indication of selectivity. This data appears in the patent in suit.

The record is clear that it was as a result of Dr. Huffman's work that 3,4-DCPA was first found to be a selective herbicide. As previously mentioned, he saw an indication of selectivity in the Midwest test of 1955. By letter of December 28, 1956, Dr. Huffman asked Dr. Hamm to test 3,4-DCPA at low rates as a post-emergence herbicide. It was as a result of Dr. Huffman's theory as to the significance of molecular size that he was able to arrive at the herbicidal activity of

3.

[A1715]

4.

[A1716]

3,4-dichloro substituted analides in general and of 3,4-DCPA specifically.

The touchstone for the determination of the validity of any patent is the strong presumption that arises in favor of that validity when the Patent Office decides to grant the patent. See Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937). As is provided by 35 U.S.C. § 282, "A patent shall be presumed valid. The burden of establishing invalidity of a patent [or any claim thereof] shall rest on a party asserting it." Because of the expertise with which the personnel of the Patent Office are endowed, that burden is a heavy one.

One of the defenses raised is that the chemical compound 3,4-DCPA was anticipated within sections 102(a) and (b) of Title 35, U.S.C. In substance, these sections provide that a person is entitled to a patent unless certain conditions are present. Those conditions include, among other things, the invention being known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before it was invented by the applicant. 35 U.S.C. § 102(a). Similarly, subsection (b) precludes one's right to a patent if the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. In order for there to be an anticipation by way of description within the meaning of section 102(a) and (b), it is necessary that the prior art reference disclose the composition of matter claimed. Smith, Kline & French Laboratories v. Clark & Clark, 157 F.2d 725 (3rd Cir. 1946). Defendants have cited two references, each of which they contend discloses 3,4-DCPA.[5] Those references are a 1938 United States Patent No. 2,133,340 to Bienert and a 1928 literary composition

by Cornelia Fontein in Recueit Trav. Chim., volume 47, pages 635–37.

The Bienert patent is directed toward the synthesis of acylamino phthalocyanine dyes. The starting materials used in this synthesis fall into three general classes of chemical compounds. All three classes are characterized by an acylamino substituent on a benzene ring. Further, one class has ortho-dinitrile benzene substituents, a second class has ortho-halonitrile benzene substituents, and a third class has ortho-dihalo benzene substituents. Each of these classes include many thousands of compounds. At trial the defendant's expert witness testified that Bienert, by using the following language, designated a preferred or narrowed class within these many thousands of compounds:

"As starting material o-dinitriles of that benzene series are used which have as substituents an amino group wherein a hydrogen atom is substituted by the radical of an aliphatic or aromatic acid, f.i. by acetyl, butyryl, propionyl, benzoyl, methyl benzoyl, methoxy benzoyl, etc. Or course, there may also be used as starting materials such compounds of the benzene series which contain an acylamino group and which are suitable to be transformed into o-dinitril compounds during the reaction as o-halogen nitriles and o-dihalogen benzenes."

Defendants' expert agreed, however, that even this narrowed and preferred class, if that it was, included at least 500 compounds.

While Bienert discloses broadly the class of orthodihalobenzene derivatives, it contains no specific disclosure of any such dihalobenzene derivative, or of a dichlorobenzene derivative. The only halogen derivative specifically mentioned is a bromine substituted compound. Bienert does not contain the word "3,4-dichloropropionanalide" or a structural formula for the compound 3,4-dichloro-

5. For reasons which will be explicitly presented below, the only references which raise the anticipation question are those prior to the filing date of the 1957 application.

propionanalide or any other indication of this specific compound. There is no indication in the Bienert patent that Bienert either made or contemplated making the compound 3,4-dichloropropionanalide. The only utility disclosed by the Bienert patent for the ortho-dihalogen derivatives encompassed within the third class of compounds disclosed is as a chemical reactant used to prepare a further chemical reactant which in turn is used to make a phthalcyanine dye. There is no mention in Bienert that any of these compounds would be effective as herbicides.

The Fontein article cited above is a chemical mechanism study and does not disclose or purport to disclose a class of compounds. It discusses a rearrangement of an N-chloroacylanalides to a 4-chloroacylanalides and seeks to discover the effects of a structural change upon this rearrangement. If each of the possible permutations and combinations of the reaction generally illustrated on page 638 of the Fontein article were carried out, which they were not, a minimum of 40 possible compounds could be conceivably prepared. One of these 40 might be 3,4-DCPA, but Miss Fontein actually carried out only nine such reactions and got only nine compounds, none of which was 3,4-DCPA. It was not necessary for her to use 3,4-DCPA to perform the tests she undertook. The Fontein article discloses no interest in the utility of any of the nine compounds said to have resulted from her mechanism study.

It has long been a principle of patent law that a prior art reference, whether the reference is an earlier patent or some other publication, does not anticipate unless it is disclosed in such full, clear, and exact terms as to enable any person skilled in the art to which the invention relates to practice it. Deller's Walker on Patents, Vol. 1, sections 60 and 61 at pages 277, 285. As the Supreme Court said in Seymour v. Osborne, 78 U.S. (11 Wall.) 516, 20 L.Ed. 33 (1871):

"Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contained and exhibit a substantial representation of the patented improvement in such full, clear and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct and practice the invention to the same practical extent as they would be enabled if the information were derived from a prior patent. *Mere vague and general representations will not support such a defense, as the publication must be sufficient to enable those skilled in the art or science to understand the operation of the invention, and to carry it into practical use.* Whatever may be the particular circumstances under which the publication takes place, the account published to be of any effect to support such a defense must be an account of a complete and operative invention capable of being put into practical operation." (20 L.Ed. 42— Emphasis added.)

A mere suggestion in a prior art reference is not enough, and vague, indefinite, or ambiguous disclosures do not anticipate. Deller's Walker on Patents, *supra,* at p. 286.

Since it is true in determining anticipation each reference must be considered separately, one by one, and not in combination, Firestone v. Aluminum Co. of America, 285 F.2d 928 (6th Cir. 1960), it would seem that judged by these standards neither the indirect reference to 3,4-DCPA in Fontein, nor the generic class of compounds mentioned in Bienert is by itself a sufficiently clear disclosure as to constitute an anticipation. Defendants, however, contend that a skilled chemist upon reading either of these references would immediately envisage the compound 3,4-DCPA. In doing so, they rely upon such cases as In re Baranauckas, 228 F.2d 413, 43 CCPA 727 (1955); In re Petering, 301 F.2d 676, 49 CCPA 993 (1962); In re Rosicky, 276 F.2d 656, 47 CCPA 859 (1960); and Merck & Co. v. Marzall, 91 U.S.App.D.C. 50, 197 F.2d 206 (1962).

In *Baranauckas, supra,* the applicant claimed as a compound 1,2,3,4-tetracyclopentadine. A prior art patent showed that cyclopentadine reacted with a hypobromite solution to form hexabromocyclopentadine. The prior art teaching made it clear that chlorine could be interchanged with bromine and the structural formula of the compound 1,2,3,4-tetrabromocyclopentadine was presented as an intermediate step. This, the court held, was a disclosure, though the applicant's claimed compound was not specifically named. *Baranauckas, supra,* is to be contrasted from the facts of the case at bar in that the range of possibilities for the substitution of various elements is much narrower. There, only chlorine and bromine were interchangeable, whereas here, there are forty possible compounds in the Fontein article and a minimum of 500 possible compounds in Bienert. Nothing is to be found in either reference pertaining directly to 3,4-DCPA.

In re *Petering, supra,* is another case in which the applicant's claimed compound was held to be anticipated. There, certain of the applicant's claims were generically disclosed in a prior art patent, the author of which clearly indicated a preference for a particular class of compounds, which included some twenty members. The court in reaching this result concluded that one skilled in the art, which was pharmacology, on reading the earlier patent would at once envisage each member of the limited class preferred. This holding, which was limited by the court strictly to its facts, has no application here, again because of the large class of compounds mentioned in Bienert and the large number of potential compounds which could be synthesized by the various reactions in the illustration at page 638 of Fontein.

In re *Rosicky, supra,* held that the applicant's claimed compound, useful for its spasmolytic and antihistiminic properties, was anticipated by reason of a generic disclosure in a prior patent. The court, however, emphasized that one of the medicinal properties cited in the application was disclosed in the patent held to be anticipatory; here, neither the properties of Bienert's starting material nor those of the compounds yielded by the reaction illustrated in the Fontein article are so disclosed.

In *Merck & Co. v. Marzall, supra,* the Patent Office rejected the applicant's claim for thiamin mononitrate as a compound. This rejection was based on a prior art patent specifically disclosing a closely related compound, thiamin monobromide, but specified that the nitrate radical along with several other substituents could be used interchangeably. The court upheld the rejection by the Patent Office. Unlike the facts of the present case, there was in *Merck & Co. v. Marzall, supra,* a direct reference to the plaintiff's claimed compound by the specific contemplation in the prior art reference of thiamin mononitrate. Here, the prior art is devoid of a specific contemplation of 3,4-DCPA.

As a general matter, the size of each class of compounds held to anticipate in each of these cases is more limited than the genus discussed in the Bienert patent and the projections made in the Fontein article. Moreover, in each of these cases it is to be observed that there is a logical relationship between the properties disclosed in the prior art references and the properties inherent in the claimed compound in dispute. The facts of the present case are more closely analogous to those of In re *Ruschig,* 343 F.2d 965, 52 CCPA 1238 (1965). There, the Patent Office rejected Rushig's application on the ground that the claimed compound was generically disclosed in a prior art patent. The Board of Patent Appeals affirmed in an opinion relying upon the *Petering* case, *supra.* The court reversed, holding that the Board's reliance on *Petering, supra,* was misplaced because of the diversity and the generality of the possible compounds:

"We did not intend our Petering opinion or decision to become a precedent for the mechanistic dissection and recombination of the components of the

specific illustrative compounds in every chemical reference containing them, to create hindsight anticipations with the guidance of an applicant's disclosures, on the theory that such reconstructed disclosures *describe* specific compounds within the meaning of section 102." (343 F.2d 974—emphasis the Court's.)

Hindsight anticipations mentioned in *Rushig, supra,* is the very thing defendants have attempted here. They have seized upon a passage from the Bienert patent and an illustration from the Fontein article, pointed to each of the chemical substituents found in each reference, recombined certain of them to form the compound 3,4-DCPA, and then have attached to each reference the magic label of anticipation. This they cannot do.

It is clear beyond doubt that even after Dr. Huffman discovered 3,4-DCPA, the fact of that discovery would not lead one of ordinary chemical skills to anything which might be in the prior art. Prior to that discovery, no one had ever prepared 3,4-DCPA and it could not be found on any chemical list in the world. Certainly, there is nothing in the Bienert patent or the Fontein article, neither of which manifests any interest in herbicides, to draw the attention of those engaged in herbicide research. Dr. Huffman did testify on cross-examination that it would take a skilled chemist only an hour to write down the equation in the portions of Bienert and Fontein defendants have cited, but on redirect examination he further testified that it would take two years to synthesize all the chemicals yielded by the reactions represented by these various formulas.

Dr. Huffman concluded that a skilled chemist upon seeing either reference would not immediately envisage 3,4-DCPA. An expert offered by defendants, Dr. Roberts, testified to the contrary, that a skilled chemist would immediately see 3,4-DCPA. Whether or not it would be immediately seen depends upon one's point of view. Hindsight anticipation would make it easy for Dr. Roberts to say that he would immediately see 3,4-DCPA when it is that exact compound he has in mind as he considered each reference. On the other hand, someone who was not already thinking of 3,4-DCPA would not immediately envisage it as a member of the class of compounds named. To put it differently, one who reads either of the cited references is in a position analogous to one who is taking a Gestalt test, widely used in the field of psychology. For instance, if the test consists of a sketch of a jungle scene drawn in such a manner as to conceal within its lines certain creatures which are known to inhabit the jungle, a person who studies the drawing long enough will begin to perceive of all the animals which are formed within the drawing. Whenever he again has occasion to see the same picture, he immediately finds all the animals which were not immediately apparent to him the first time he laid his eyes upon it. So here, when the eyes of a skilled chemist come upon Bienert or Fontein, they immediately see 3,4-DCPA when that is the very compound the chemist has in mind when studying these references. It is to be concluded, therefore, that 3,4-DCPA is not anticipated by the prior art.

Defendants also contend that 3,4-DCPA is not patentable because of certain other information known to the public more than one year prior to the 1967 application. Specifically, defendants refer to Southwest Africa Patent No. 827/59, describing and claiming 3,4-DCPA as a selective post-emergence herbicide, issued to Rohm & Haas Company, a copy of which was obtained by Monsanto by September 10, 1959. Defendants also call attention to the Southern Weed Conference attended by Monsanto representatives in January, 1960, where Dr. Roy Smith of the United States Department of Agriculture presented a report describing 3,4-DCPA as a selective post-emergence herbicide. The report was published in April, 1960. Finally, defendants point out that Monsanto learned as early as April, 1961, that Rohm & Haas had marketed a product known as "Stam F-34" containing 3,4-DCPA.

These facts, however, bear no relationship to whether 3,4-DCPA is in the prior art. The claims made in the 1967 application relate back to the disclosures in the 1961 application, which in turn relate back to those in the 1957 application.[6] For purposes of determining the state of the prior art, the effective filing date of the claimed subject matter is May 27, 1957.[7] The basis of this conclusion is 35 U.S.C. § 120, which provides:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

The first paragraph of section 112 requires that the specification of the patent application "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

 To come within the purview of 35 U.S.C. § 120, the following qualifications must be met by the latter patent application. (1) The same invention must be disclosed. (2) It must be by the same inventor. (3) It must be filed before the patenting of the first application. (4) It must contain a specific reference to the earlier filed application. There are no conditions other than those of section 120. Technicon Instruments Corp. v. Coleman Instruments, 255 F. Supp. 630 (N.D.Ill.1966), affirmed 385 F.2d 391 (7th Cir. 1967). These requirements have been fulfilled here. The same invention disclosed in the 1967 application, 3,4-DCPA, is similarly disclosed in the 1961 and 1957 applications. In each is a written description of the compound, the method of synthesization, and the directions for use, all of which are set forth with sufficient specificity to comply with section 112. Dr. Huffman was named as the inventor in each application. No patent has been granted on any application other than the one made in 1967. Finally, each subsequent application refers to the one immediately preceding it. Consequently, the only prior art references which have been considered are those which predate the filing of the 1957 application.

 The next issue raised by defendants is whether or not plaintiff's patent is obvious within 35 U.S.C. § 103. The terms of that provision are:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In determining section 103's obviousness, the prior art must be considered in its entirety. Deller's Walker on Patents, Vol. 2, sec. 107, p. 114. In this case the entire prior art includes Bienert, Fontein, and a closely related compound which also has herbicidal properties, 3,-4-dichloroacetylanalide. At first, the patent examiner rejected plaintiff's 1960

---

6. This sufficiently negates any notion that plaintiff abandoned the claimed compound, 3,4-DCPA.

7. See fn. 5, supra.

application as being obvious from 3,4-dichloroacetylanalide.[8] To overcome the rejection based on these grounds, plaintiff submitted the affidavit of Dr. Robert Husted which told of the results of various tests comparing the herbicidal effects of 3,4-DCPA, 3,4-DCAA, and other related compounds. The plants to which 3,4-DCPA and 3,4-DCAA were applied included cotton, cocklebur, crab grass, barnyard grass, sugar beet, wheat, velvet leaf, rice, wild buckwheat, foxtail, and radish. At one of the rates at which the herbicides were applied, two pounds per acre, 3,4-DCPA exhibited with all plants, except for rice and wheat which were unaffected, severe phytotoxicity with the barnyard grass and foxtail and fatal phytotoxicity with the remainder of the plants tested. 3,4-DCAA, however, showed only slight phytotoxicity with most of the plant species, including rice, and no phytotoxicity with the others. On the basis of this information, the patent examiner set aside the earlier rejection and granted the patent.

▮▮▮ Before a chemical compound can be held as unobvious over another prior art compound which is closely related structurally as 3,4-DCAA is to 3,4-DCPA, it is necessary that the former possess unexpected beneficial properties in fact not possessed by the latter. In re Henze, 181 F.2d 196, 37 CCPA 1009 (1950); In re Mod, 408 F.2d 1055 (CCPA 1969). It is not sufficient that there be merely a difference in degree, In re Henze, *supra*; the claimed compound must be markedly superior. In re Coes, 173 F.2d 1012, 36 CCPA 1067 (1949). Those circumstances are present in this case. 3,4-DCPA does not differ from 3,4-DCAA merely in degree of phy-

totoxicity, but is markedly superior as to the varieties of plants which are affected by it. The patent examiner correctly concluded that 3,4-DCPA does in fact possess unexpected beneficial properties not obvious from 3,4-DCAA. There is certainly nothing in Bienert or Fontein, considered together, which would alter that conclusion. It is held, therefore, that 3,4-DCPA is not obvious from the prior art.

Notwithstanding this finding of lack of obviousness, defendants urge that the patent is invalid because plaintiff allegedly withheld from the Patent Office certain information tending to show that 3,4-DCPA was obvious from 3,4-DCAA. This information consisted of the results of tests in which 3,4-DCPA and 3,4-DCAA had been applied at two pounds per acre to plant species not mentioned in the Husted affidavit and at rates of application other than that of two pounds per acre to all plant species tested. Some of the items not mentioned in the affidavit include (1) that pigweed is equally vulnerable to both 3,4-DCPA and 3,4-DCAA at two pounds per acre which is sufficient to kill it, (2) that at two pounds per acre, 3,4-DCPA exhibits only moderate phytotoxicity on morning glory and wild oat and no phytotoxicity on brome, and (3) that generally 3,4-DCPA is less active at application rates under two pounds per acre. In addition, the Husted affidavit shows that radish is completely killed at two pounds per acre while the test chart, on which the affidavit is based, shows only moderate phytotoxicity at that rate.

▮▮▮ The crux of defendants' argument is that plaintiff breached its duty to the Patent Office and to the pub-

---

8. Herein 3,4-DCAA, the structural formula for which is:

[A1717]

lic by failing to disclose in the affidavit all of the information gained through the tests conducted by Dr. Husted. In effect, they are charging that plaintiff perpetrated fraud upon the Patent Office. If this is true, then, of course, the patent is unenforceable. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F.Supp. 1, 21 (E.D.Pa.1958), affirmed 268 F.2d 395 (3rd Cir. 1959). Compare Precision Instr. Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) wherein it was held that the equitable doctrine of unclean hands barred plaintiff from enforcing a patent against an infringer when the patent was issued upon the basis of perjured testimony and suppression of facts which plaintiff had reason to know about. To establish this defense, it is necessary that defendants prove several elements, including the making of false or misleading statements and an intent to deceive the patent examiner. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 471 (D.C.Del.1966), rev'd. on other grnds., 374 F.2d 473 (3rd Cir. 1967). There is also a further requirement that defendant must prove that the information was material in the sense that if the patent examiner had known of the additional facts regarding the Husted test, he would not have issued the patent. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., supra, 169 F.Supp. pp. 24–25; Charles Pfizer & Co. v. Federal Trade Commission, 401 F.2d 574 (6th Cir. 1968); But Contra, Corning Glass Works v. Anchor Hocking Glass Corp., supra. Unless this essential materiality is demonstrated a false statement will not destroy the validity of the patent. Edward Valves, Inc. v. Cameron Iron Works, 286 F.2d 933, 947, (5th Cir. 1961). The burden on defendants in their efforts to prove fraud is a heavy one. Edward Valves, Inc. v. Cameron Iron Works, supra. The law is settled that the proof of fraud must be clear, unequivocal, and convincing and a mere preponderance of the evidence which leaves the issue in doubt may not properly be a basis for a finding of fraud. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., supra, 169 F.Supp. p. 25. When these guidelines are applied to the present case, the inescapable conclusion is that defendants have failed in their burden of proof. The only misinformation presented to the Patent Office is the degree of phytotoxicity of 3,4-DCPA on radishes. There is no evidence that this small corner of a broad picture presented to the patent examiner materially influenced the decision to grant the patent. The remaining contention on unclean hands relates not to what was said, but rather to what was not said. Defendants have not established that the withholding of this information was done with intent to deceive the Patent Office. They have similarly failed to prove the materiality of the information withheld, that the patent examiner would have rejected the application had he known of the matters said to be withheld as was true in Charles Pfizer & Co. v. FTC, supra. To overcome the initial rejection by the patent examiner, it was necessary for plaintiffs to convince her that 3,4-DCPA had properties neither predictable from, nor in fact possessed by, 3,4-DCAA. By the manner in which they went about this task, plaintiffs did nothing more than put their best foot forward. Defendants' contentions on this point are therefore without merit.

Another ground upon which the validity of plaintiff's patent is attacked is that plaintiff, by waiting until 1967 to make a divisional application focusing upon 3,4-DCPA as a compound, are guilty of late claiming and laches.[9] The origin of this "late claiming" defense is found in the Supreme Court's decision in Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). There, it was held that claims added by amendment to a pending application for a patent do not furnish the basis for a

---

9. In this context at least, there seems to be no perceivable difference between those two terms.

**464**

valid patent if there was public use or sale of the device which they are claimed to cover more than two years before the first disclosure of the subject matter of these claims to the Patent Office, even though the use or sale was not more than two years prior to the original application.[10] The justification for this rule is that a patentee should not be permitted to claim the invention of another which has gone into public use—that is, to appropriate that which has gone into the public domain for which he was not really responsible. Chicago & N. W. Ry. Co. v. Sayles, 97 U.S. 544, 24 L.Ed. 1053 (1878). See also Webster Elec. Co. v. Splitdorf Elec. Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924); Pratt & Whitney Co. v. United States, 345 F.2d 838, 170 Ct.Cl. 829 (1965); Woofter v. Carlson, 367 F.2d 436, 54 CCPA 917 (1966); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2nd Cir. 1946); Jones v. Freed-Eiseman Radio Corp., 47 F.2d 174 (2nd Cir. 1931); Veaux v. Southern Oregon Sales, Inc., 33 F.Supp. 605 (D.Ore.1940), affirmed 123 F.2d 455 (9th Cir. 1941). In each of these cases, it was held that patent claims added by way of amendment or division of an original patent application were not valid when (1) the original claims were broadened to include subject matter theretofore not presented and (2) the subject matter had become known to the public before the claims were ever made. Here, 3,4-DCPA was specifically carved out of the parent application in the 1967 division. This represented a narrowing rather than a broadening of the previous applications. These circumstances are controlled by Locklin v. Switzer Bros. Inc., 299 F.2d 160 (9th Cir. 1961). In that case, the original patent application filed in 1954 claimed a resin useful in the manufacture of pigments in the process of obtaining that resin. These claims did not then provide what amount of melamine was required to render the resin substantially insol-

uble in aromatic hydrocarbon solvents. Accordingly, the original application was amended in 1957 and the patent was issued upon the amended application. The court held the "late claiming" doctrine of *Muncie Gear Works, supra,* to be inapplicable.

"Here the feature of insolubility was disclosed in the specifications of the original aplication, although its bearing upon the critical limit in the amount of melamine was not expressed. We are not then faced with a claim of new matter nor with an attempt to rectify an inadequate disclosure or to appropriate subsequent developments or discoveries. The amendment actually amounted to no more than a narrowing of the claims to articulate a limitation implicit in the specifications but not explicit in the claims themselves. The circumstances under which the amendment was filed would indicate that it resulted from the ordinary give and take of Patent Office procedures: the shaping of the expression of that which was sought in order to make it conform appropriately to that which it was felt could properly be granted. "We conclude under these circumstances that no intervening public rights can be said to have attached to the insolubility feature of the Kazenas patent or to the matters incorporated in the claims by amendment * * *." (299 F.2d 167)

Plaintiffs are not guilty of either late claiming or laches.

▮ Before this opinion is concluded, it should be added that the possible effect of the decision in Monsanto Co. v. Rohm & Haas Co., 312 F.Supp. 778 (E.D.Pa.1970) upon the result here reached has been carefully considered. Even though there is an identity of subject matter between that case and this one, the fact nevertheless remains that there is no identity between the parties

10. The two year period mentioned in the phrasing of this holding would now be one year by virtue of an amendment to

section 4886, Revised Statutes, an earlier version of 35 U.S.C. section 102(d).

defendant, nor for that matter is there any privity between the parties defendant in each respective action. Moreover, the defendants here have placed greater emphasis on certain prior art items, namely, Bienert and Fontein, than did the defendants in Monsanto Co. v. Rohm & Haas, Co., *supra*, though it is not clear whether the court in that case had exactly the same evidence before it as was offered here. The result on the issues resolved in Monsanto Co. v. Rohm & Haas Co., *supra*, does not therefore relieve this Court of its judicial travail of reaching its own independent decision on the merits of the case between these parties and on this record, even though this brings about diametrically opposed decisions on the validity of the same patent against the same attack. There is no res judicata or estoppel by judgment flowing from the earlier decision precluding plaintiff from its day in court against these defendants. Bros, Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208 (5th Cir. 1965); Edward Valves, Inc. v. Cameron Iron Works, *supra;* Graham v. Cockshutt Farm Equipment, 256 F.2d 358 (5th Cir. 1958); Miles v. Mathews, 171 F.2d 38 (5th Cir. 1948).

For the reasons discussed herein, a decree will be entered enjoining defendants, their officers, servants, employees, and agents from infringement of Letters Patent No. 3,382,280. Judgment will be entered for Monsanto on defendants' counterclaim. Monsanto's request for attorneys' fees is denied, this case not being an exceptional one within the meaning of Title 35, section 285. The Clerk of this Court is directed to file this Memorandum and Order and forward copies to the attorneys of record. This Memorandum and Order constitutes this Court's findings of fact and conclusions of law.

Counsel for Monsanto is directed to prepare a Final Judgment in accordance with this Memorandum and Order and submit same to the Court by May 4, 1970 for entry, after first obtaining approval as to form from counsel for defendants.